# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ian H. Levin | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7477 | **DATE** | 7/9/2002 |
| **CASE TITLE** | | Criner vs. Barnhart | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Plaintiff's motion for summary judgment or remand is granted. Defendant's motion for summary judgment is denied. The Cause is reversed and remanded to the Commissioner of Social Security with instructions for an immediate award of benefits consistent with the Memorandum Opinion and Order. Judgment is entered pursuant to Rule 58 F.R.C.P. Enter Memorandum Opinion and Order. This cause is hereby terminated.

(11) ☐ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required. | | | number of notices | | |
| | Notices mailed by judge's staff. | | | | | |
| | Notified counsel by telephone. | | | JUL 1 0 2002 | | 24 |
| ✓ | Docketing to mail notices. | | | date docketed | | |
| | Mail AO 450 form. | | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | | |
| | | courtroom deputy's initials | U.S. DISTRICT COURT CLERK | date mailed notice | | |
| | mm | | 02 JUL -9 PM 4: 14 | | | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PAMELA CRINER, | ) | **DOCKETED** |
| | ) | |
| Plaintiff, | ) | JUL 1 0 2002 |
| | ) | |
| v. | ) | Case No. 01 C 7477 |
| | ) | |
| JO ANNE B. BARNHART, | ) | Magistrate Judge Ian H. Levin |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Pamela Criner ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) for

judicial review of the final decision of the Commissioner of the Social Security Administration (the

"SSA") denying her application for Disability Insurance Benefits ("DIB") under the Social Security

Act (the "Act"). Before the Court is Plaintiff's Motion for Summary Judgment or Remand, and

Defendant's Motion for Summary Judgment. For the reasons set forth below, the Court reverses the

ALJ's decision and remands the cause for an immediate award of benefits.

## PROCEDURAL HISTORY

On November 3, 1997, Plaintiff filed an application for DIB stating that she became unable

to work on February 20, 1997, due to disabling conditions.[1] (R. 126-28.) Plaintiff's initial application

for benefits was denied, and subsequently, upon review, Plaintiff's request for reconsideration was

---

[1]References are to the certified administrative record prepared by the Commissioner and
filed with this Court pursuant to 42 U.S.C. § 405(g).

In making its arguments herein, Defendant does not contest the disability date of February
20, 1997 argued by the Plaintiff.

also denied. (R. 98, 108.) Plaintiff then filed a request for an administrative hearing on July 31, 1998. (R. 111.) On January 21, 1999, Plaintiff appeared with counsel and testified at a hearing before an Administrative Law Judge ("ALJ"). (R. 42-84.) A Vocational Expert ("VE") was also present and testified at the hearing. (R. 84-94.)

On June 25, 1999, the ALJ issued his decision finding that Plaintiff was not disabled because she had the residual functional capacity to perform the requirements of work with stated limitations. (R. 30-31.) Plaintiff filed a request for review of the ALJ's decision, and on July 24, 2001, the Appeals Council denied Plaintiff's request for review making the ALJ's decision the final decision of the Commissioner. (R. 7-8, 14.) Pursuant to 42 U.S.C. § 405(g), Plaintiff initiated this civil action for judicial review of the Commissioner's final decision.

## BACKGROUND FACTS

### I.    MEDICAL EVIDENCE

#### A.    Plaintiff's Physical Condition

Plaintiff's allegations of disability are based on the following conditions: fibromyalgia, severe arthritis in her back and hands and tendentious, sacroiliitis, pelvic malalignment, weakness in her hands, pain in her back and right shoulder, right lateral epicondylitis, chronic pain and fatigue, depression, anxiety, and personality disorder. (R. 144, 177, 183-85, 190, 197, 205, 667.)

On December 30, 1993, Dr. J. Uhler, M.D. reported that an X-ray of Plaintiff's spine revealed narrowing of the disc space on C5-6. (R. 209.) Dr. S. Sherman reported on January 14, 1994 that EMG testing revealed carpal tunnel syndrome in Plaintiff's right wrist. (R. 207-208.) Plaintiff was subsequently diagnosed with carpal tunnel syndrome in her right wrist by Dr. David Trotter, M.D. (R. 621-22.) Dr. Trotter treated Plaintiff's condition with a night splint program which included a

resting hand splint and occupational therapy. (R. 622.) Because her symptoms did not subside, on

June 20, 1994, Dr. Trotter performed carpal tunnel release surgery on Plaintiff. (R. 622-23.)

Subsequent to Plaintiff's routine post-surgery visit, she, again, saw Dr. Trotter on July 14,

1994 and July 28, 1994. (R. 621-22.) Dr. Trotter reported that Plaintiff seemed to have significant

tenosynovitis. (R. 621.) Plaintiff was treated with a Medrol Dosepak[2] and Dr. Trotter considered

referring Plaintiff to a rheumatologist if she did not improve. (R. 621.) On September 1, 1994, Dr.

Trotter reported that Plaintiff still had symptoms of tenosynovitis in her right wrist and thumb and

again, he considered referring Plaintiff to a rheumatologist. (R. 621.) Subsequently, on October 4,

1994, Dr. Trotter reported that Plaintiff's symptoms had not improved and referred her to a

rheumatologist. (R. 621.)

### Plaintiff's Treating Physician

Dr. Cary Dachman, M.D. has been Plaintiff's treating physician and rheumatologist since

November 1, 1994. (R. 725.) Dr. Dachman is Board Certified in internal medicine, pain management

and rheumatology, the Director of the Schaumburg Pain Therapy Center, and a Fellow of the

American College of Rheumatology. (R. 475.) Dr. Dachman reported on November 1, 1994 that

subsequent to Plaintiff's carpal tunnel surgery in May, 1994, she was still experiencing problems

with her thumb joints locking up, radiating pain, and pain in her right hand. (R. 725.) Dr. Dachman

also noted slight discoloration in Plaintiff's right hand and significant palmar swelling that was more

diffuse than normal. (R. 728.) Dr. Dachman further noted periscapular trigger points, as well as

spasms around the neck with some limitation of neck range of motion. (R. 728.)  In addition,

---

[2]Medrol Dosepak is not listed in the 56th ed. of the *Physicians' Desk Reference* ("*PDR*")
(56th ed. 2002).

possible cervical radiculopathy was noted at that time. (R. 728.) On November 3, 1994, Dr. Dachman wrote a letter to Plaintiff stating that she appeared to have inflammation of the tendons of both of her thumbs. (R. 722.) Dr. Dachman prescribed Prednisone and explained the side-effects of the medication to Plaintiff. (R. 722.)

On November 19, 1994, Dr. Dachman reported that Plaintiff had "[a] considerable amount of periscapular trigger points and subscapular trigger points for which injections were given to six locales." (R. 720.) In his report, Dr. Dachman noted, "Diagnosis of fibrositis substantiated" subsequent to EMG testing of Plaintiff. (R. 720.) Moreover, on December 6, 1994, Dr. Dachman noted, "This date [Plaintiff] has severe periscapular trigger points." (R. 720.) Furthermore, on December 9, 1994, Dr. Dachman explained to Plaintiff in a letter that she was being treated for fibrositis. (R. 718.) In Dr. Dachman's letter, he stated:

> Per our conversation, I have given [Plaintiff] six trigger points for fibrositis.
>
> Fibrositis is a diffuse inflammation of all soft tissues in the body. It specifically relates to a fall in endorphin levels, our normal shock absorber. Endorphin is a compound which is thought to be 30 times more powerful than morphine and is secreted only during deep sleep phases. If you do not achieve deep sleep, these endorphins may be depleted and a secondary and diffuse pain syndrome will result.
>
> This lack of endorphin, this lack of our normal shock absorber then results in the pain and inflammation that is experienced, the so called fibrositis state.
>
> . . . . (R. 718.)

Dr. Dachman diagnosed Plaintiff with fibromyalgia and began treating her for this condition in 1995. (R. 667.)

On January 13, 1995, Dr. Dachman recommended that Plaintiff continue her treatment with

Zoloft[3] and Ambien.[4] (R. 716.) Dr. Dachman saw Plaintiff in April 1995 and diagnosed severe pelvic malalignment and fibrositis. (R. 709-10.) Multiple trigger points were also noted along with tenderness over both occipital locales. (R. 710.) Dr. Dachman recommended bilateral greater occipital nerve blocks, four parascapular trigger points, physical therapy, soft tissue immobilization, and electrical stimulation to the neck and parascapular locales. (R. 710.) Plaintiff's treatment with Zoloft and Ambien was continued. (R. 712.)

On May 2, 1995, Dr. Dachman reported that Plaintiff had developed acute sciatica and stated in his report that, "This is manifest as additional complications, with sacroiliitis and left hip bursitis." (R. 707.) Plaintiff received Depo-Medrol injections, her treatment with Zoloft, Ambien and Klonopin[5] was continued, and physical therapy was initiated. (R. 707.) In a May 31, 1995 letter, Dr. Dachman stated that he continued to diagnosis Plaintiff with the same conditions; namely, fibrositis, sacroiliitis, and possible sciatica. (R. 703.) Dr. Dachman stated that "She really [has] not improved with her current therapeutic regimes." (R. 703.)

On July 18, 1995, Dr. Dachman indicated that Plaintiff "still has significant back arthropathy which is not responsive to her current therapeutic modalities." (R. 701.) Dr. Dachman further noted that "Currently, she is not getting better and really is quite status-quo; additional medications will be contemplated such as Gabapentin or Clonidine, [depending] on her response to the therapy and epidurals thereof." (R. 701.) On August 24, 1995, Dr. Dachman noted that Plaintiff's medications

---

[3]Zoloft is prescribed for the treatment of major depressive disorder. *PDR* at 2752.

[4]Ambien is prescribed for the short-term treatment of insomnia. *PDR* at 3192.

[5]Klonopin is prescribed for patients with absence seizures (petit mal) who have failed to respond to succinimides. *PDR* at 2983.

continued to include Zoloft, Daypro[6], and Klonopin. (R. 700.) Point tenderness was noted over the SI joint and facet locales; two SI joint injections and two facet point injections were administered; and pelvic malalignment was reported. (R. 700.) As of September 20, 1995, Plaintiff's Daypro medication was discontinued due to stomach irritation, but Oruvail,[7] Zoloft, and Klonopin were continued. (R. 697.) Work hardening and soft tissue mobilization were also continued and bilateral CMC injections were administered. (R. 697.)

Dr. Dachman continued to treat Plaintiff for her complaints of pain and spasms in her back in October, November, and December of 1995. (R. 695.) On November 2, 1995, Dr. Dachman noted that Plaintiff was to continue taking her medications; however, he also prescribed a Medrol Dosepak and SI joint injections. (R. 694.) Dr. Dachman reported,

> Currently she is doing a lot better. She is ready to return to work if she is able to sit and stand ad lib, but continues to have some lower back distress with exam revealing facet and SI joint pathology as well as left supratrochanteric and ischial bursal inflammation. (R. 694.)

Moreover, in a letter dated December 13, 1995, Dr. Dachman stated that, "This date she is clearly having a flare up of her fibromyalgia . . ." (R. 691.)

In a letter dated January 19, 1996, Dr. Dachman stated that, "At this time she is satisfactory but nevertheless, [she] still has some minimal SI joint and facet irritation for which Marcaine[8] has been utilized." (R. 688.) Furthermore, Dr. Dachman reported on March 1, 1996 that "[Plaintiff] is surely better than she was before. She is extremely happy and has much less pain. She is now

---

[6]Daypro is prescribed for the management of the signs and symptoms of osteoarthritis and rheumatoid arthritis. *PDR* (51st ed. 1997) at 2579.

[7]Oruvail is prescribed for the management of signs and symptoms of osteoarthritis and rheumatoid arthritis. *PDR* at 3549.

[8]Marcaine is not listed in the 56th ed. of the *PDR*.

labeling her pain at a level of 2 or 3 out of 10." (R. 686.)

On July 19, 1996, Dr. Dachman reported that, "At this time, having not seen [Plaintiff] for several months, she is having a recurrence of pain in her SI joints and ischial bursal locales." (R. 684.) Plaintiff received two SI joint injections and her physical therapy was continued. (R. 684.) As of August 19, 1996, Plaintiff's condition had not changed from her initial diagnosis of tenosynovitis, fibromyalgia, and facet syndrome. (R. 683.) On September 3, 1996, Dr. Dachman conducted a complete history and physical examination of Plaintiff and noted that there were no changes in her condition. (R. 681.) Dr. Dachman noted SI joint discomfort and localized SI joint tenderness was identified. (R. 681.) Plaintiff was treated with two SI joint injections of Marcaine. (R. 681.)

As of October 19, 1996, Plaintiff's medications were noted as Zoloft, Klonopin, and Ambien. (R. 677.) Plaintiff was given two knee injections and two SI joint injections, and therapy, soft tissue immobilization, and electrical stimulation were continued. (R. 677.) On October 21, 1996, Dr. Dachman sent a letter to Plaintiff explaining that Relafen[9] and Cytotec[10] had been prescribed and what side effects Plaintiff might expect from taking these medications. (R. 675-76.) Moreover, on the same day, Dr. Dachman reported that "At this time she is having a significant flare [up] of her arthropathy and fibromyalgia." (R. 674.) Injections to Plaintiff's shoulders, knees, and SI joints were administered. (R. 674.)

In December of 1996, Plaintiff was in an automobile accident after which Dr. Dachman gave

---

[9]Relafen is prescribed for the management of the signs and symptoms of osteoarthritis and rheumatoid arthritis. *PDR* at 1618.

[10]Cytotec is prescribed for the prevention of NSAID-induced gastric ulcers. *PDR* at 3202-03.

her a Medrol Dosepak for neck pain. (R. 673.) After an emergency room visit on February 19, 1997,

Dr. Dachman reported that:

> [Plaintiff] came in for severe pain. Complete examination [was] performed and reveals multiple periscapular trigger points, SI joint tenderness, tenderness over the ischial and supratrochanteric locales. I have thus given her four trigger point injections, two SI joint injections, two ischial bursal injections and two supratrochanteric injections. (R. 673.)

Dr. Dachman saw Plaintiff, again, on March 25, 1997. (R. 670.) Dr. Dachman noted that

Plaintiff should continue taking Zoloft, Klonopin, Relafen and Ambien. (R. 670.) Dr. Dachman

reported that:

> . . . . Currently [Plaintiff] still has chronic but intermittent back pain making it impossible for her to sit or stand for more than 30 minutes at a time.

> If she is able to switch her positions on a frequent basis she is fine.

> She also has trouble driving on a prolonged basis because of lower back pain which occurs after driving more than 15 or 20 minutes.

> She also has complaints of feet going numb during these driving episodes, making driving impossible. . . . (R. 670.)

In a letter dated May 6, 1997, Dr. Dachman stated that Plaintiff's condition made it

impossible for her to sit or stand for more than thirty minutes at a time. (R. 669.) Dr. Dachman,

however, indicated that Plaintiff could do part-time work where she could shift her positions

frequently. (R. 669.) Dr. Dachman also reported, "This date she is not doing too well. She is clearly

having a flare [up] of her ongoing symptomatology with periscapular trigger point pathology, greater

occipital neuralgia and SI joint and ischial bursal inflammation. Complete review of systems and

physical confirming these problems." (R. 668.) Plaintiff received four periscapular and

scapulohumeral trigger point injections, two SI joint injections, and two ischial bursal injections, all

with Marcaine. (R. 668.) Dr. Dachman also noted that therapy had helped Plaintiff increase her

range of motion, decrease her pain and increase her strength, and she was going to return to work on a part-time basis. (R. 668.) On May 15, 1997, Dr. Dachman sent a letter to the Employee Benefit Committee, in which he stated, in pertinent part:

> . . . .
>
> [Plaintiff] has been a patient of mine since 1994 . . . . She has continuously visited the Schaumburg Pain Center on an average of twice a week since 1994 for occupational or physical therapy and trigger point injections.
>
> Over a period of a year we conducted extensive testing for widespread chronic pain, parathesia [sic], tenderness, tingling and numbness in joints and muscles, fatigue, irritability to concentrate and memory impairment. The tests include MRI, CT, EMG, bone scan, x-rays and blood work. The results of those tests are enclosed. I diagnosed [Plaintiff] with fibromyalgia and began treating her for this condition in 1995. My diagnosis based on numerous physical examination[s] determining the presence of multiple tender points in characteristic locations, [Plaintiff's] physical symptoms of numbness to the point of being unable to walk, and many tests results have ruled out other disorders.
>
> . . . . Osteoarthritis and fibromyalgia make it impossible for [Plaintiff] to sit or stand for periods of thirty minutes without excruciating pain . . . .
>
> [Plaintiff] has one of the more severe cases of fibromyalgia and associated Raynaud's syndrome, along with severe arthritis in her back and hands and tendentious. In addition to the custom back brace and other procedures I am using to treat [Plaintiff] she is also undergoing physical therapy twice a week, occupational therapy for her arms and wrists, and she is following a regime of diet, exercise and medications which include Prednisone trigger point injections, Medrol, Klonopin, Zoloft, Ambien, Oruval [sic], Relafen and Cytotec. The side effects of the medications required to relieve her excruciating pain contribute to her fatigue and inability to concentrate. [Plaintiff] must remain under treatment and on medications to tolerate the pain indefinitely since a cure has not been found for fibromyalgia.
>
> . . . . (R. 667.)

Plaintiff continued to receive treatment in June, July and August 1997, which included multiple injections and continued medications. (R.663-66.) It was noted that Plaintiff's chronic pelvic malalignment with a sense of weakness proximally made it difficult for her to complete her

normal daily work activities. (R. 666.) Plaintiff's isolated pelvic malalignment and decrease in spinal

flexion confirmed her underlying facet disease and a suspected regional myofascial syndrome. (R.

666.) Moreover, on September 6, 1997, Dr. Dachman reported:

> . . . .
>
> At this time [Plaintiff] is doing better but still has some proximal muscle weakness
> of the lower extremities as well as tenderness over the SI joints and ischial bursal
> locales.
>
> She is now specifically complaining of pain radiant posterior laterally to the left heel.
>
> . . . .
>
> [Plaintiff] is also having incoordination with hand grasp and weakness in hand grasp
> thereof, associated with numbness in her fingers, specifically in the carpal
> tunnel/median nerve distribution. . . . (R. 678.)

As of October 15, 1997, Dr. Dachman reported that Plaintiff's EMG confirmed multiple and

bilateral lumbar radiculopathies. (R. 662.)  Subsequent to Plaintiff's examination on October 30,

1997, Dr. Dachman reported that Plaintiff had a complication of marked right shoulder decrement

in motion, mild right lateral epicondylitis, and minimal decrease in spinal flexion LS spine with

trigger points present. (R. 662.) In a December 23, 1997 letter, Dr. Dachman stated:

> [Plaintiff] has long term back arthritis and fibromyalgia.
>
> The back arthritis has been complicated by the diffuse aches and pains which are
> secondary to the fibromyalgia.
>
> The back arthritis has further been complicated by electromyographic evidence of a
> multiple lumbosacral radiculopathy complicating the issues.
>
> As a result of the chronic pain she has both in her shoulders, parascapular locale,
> neck and back, she has been unable to concentrate, has a significant memory
> dysfunction, has sleep dysfunction, chronic myalgias, arthralgias and fatigue.
>
> There is no way she can function in any work related environment because of her
> continued discomfort and memory dysfunction, not being able to sit or stand for more

than 30 minutes at a time.

Recent EMG and examination by Dr. Lawrence Wilkin, M.D., Ph.D., Neurologist, confirmed a multiple and mild bilateral lumbar radiculopathy complicating the issues, her degree of pain not as yet responsive to vigorous therapy, soft tissue mobilization, electrical stimulation and appropriate exercises and medicine thereof.

Her prognosis is poor in that I do not see her increasing her range of motion, decreasing her pain or increasing her strength, and wholeheartedly recommend disability.

. . . . (R. 656.)

### *State Agency Physicians*

On January 28, 1998, a state agency physician, reviewed Plaintiff's medical record. (R. 635-42.) The state agency physician opined that Plaintiff could not lift and/or carry more than ten pounds frequently or twenty pounds occasionally; she could not stand and/or walk for more than a combined total of two hours in an eight-hour workday; she could not sit for more than six hours in an eight-hour workday (with normal breaks); she could not climb ladders, ropes or scaffolds; and she could not climb ramps or stairs, balance, stoop, kneel, crouch and crawl more than occasionally. (R. 30-31, 635-42). Furthermore, on June 3, 1998, another state agency physician, reviewed the medical record and opined the exact same limitations as that of the prior state agency physician who had reviewed Plaintiff's medical record on January 28, 1998. (R. 30-31, R. 748-55.)

### B. Plaintiff's Mental Condition

Patricia DeWitt, Ph.D., began treating Plaintiff on February 8, 1997 and continued to treat her through January 1998. (R. 632.) Dr. DeWitt noted that Plaintiff had the following symptoms: depressed mood, decreased energy, grief, worthlessness, guilt, anxiousness, irritability, disruption of thought process/content, somatic complaints, and concomitant medical condition. (R. 631, 633.)

Dr. DeWitt indicated that Plaintiff's symptoms had been present for more than a year. (R. 633.) There was also a marked impairment in Plaintiff's functional ability with respect to her familial and peer relationships, financial situation, interests in hobbies or activities, physical health, sleep habits, and ability to concentrate. (R. 631, 633.) Extreme impairment was also noted with respect to Plaintiff's job functioning. (R. 631, 633.) It was further noted that Plaintiff was being treated with Zoloft. (R. 632.)

On April 15, 1998, Larry Gelman, Psy.D. conducted a consultative psychological evaluation. (R.777.) In Dr. Gelman's report, he stated that Plaintiff related to him in a cooperative and responsive manner, maintained appropriate eye contact and displayed an adequate awareness of her situation. (R. 778.) Dr. Gelman further stated that, "Very often, [Plaintiff] needed to move around and change her posture." (R. 778.) Dr. Gelman observed that Plaintiff's speech was slow and pressured, and that her thought process was slow and often indecisive. (R. 778.) He further reported that "[Plaintiff's] expressed thought content was comprised of helplessness, hopelessness, somatic concerns, and fleeting suicidal ideation." (R. 778.) Dr. Gelman also stated that "[Plaintiff] reported that she cries easily and when she is angered, she will throw articles or will need to move around a lot." (R. 779.)

With respect to cognitive functioning, Dr. Gelman indicated that Plaintiff performed lower than might be expected on a visual organization assessment. (R. 779.) Plaintiff also appeared to be severely depressed with feelings of extreme vulnerability and was often edgy, irritable, apprehensive, negative, and hypersensitive. (R. 779.) Dr. Gelman's diagnostic impression was as follows:

> The onset of [Plaintiff's] predominant symptoms appear to be correlated with reported sequelae to the auto accident in 1998. Although specialized neuropsychological and neurological assessments would be recommended to confirm

or disconfirm such suspicions, an organic hypothesis concerning mood changes secondary to closed head injury cannot be ruled out at the present time. Therefore, a diagnosis of Mood Disorder Due to General Medical Condition(s) seems warranted and subsumes both severe depression and anxiety related reactions.

Additionally, characterological concomitants are perhaps better and more conservatively evaluated a Personality Disorder Not Otherwise Specified, which implies that [Plaintiff's] adaptive resources may be insufficient at the present time (and foreseeable future) to meet or address her daily adjustive demands.

Finally, this individual appears overwhelmed with both perceived and experienced threats to her self-esteem. Her pre-morbid history seems to suggest functionality across major life domains within normal limits.

Now, however, everything in her life is extremely difficult, frustrating and exhausting. Sheer force of will and perseverance are no longer enough for [Plaintiff] to readily prevail. From her point of view, she is virtually beaten. The fact that she continues to seek medical and psychological services is a testimony to her desire not to die. . . . (R. 779-80.)

On June 3, 1998, a state agency psychologist reviewed the record and opined that Plaintiff could follow detailed instructions; she needed a routine and simple work setting where speed was not essential; and she could not have frequent public interaction. (R. 744-46.) The state psychologist, however, found that Plaintiff possessed adequate basic social skills and could adapt adequately to daily changes. (R. 746.)

## II.     PLAINTIFF'S BACKGROUND/TESTIMONY

Plaintiff was born on February 10, 1951 and was forty-seven years old at the time of the onset of her disability in February 1997. (R. 43, 126.) Plaintiff has a high school education and completed sixty college credits at Madonna College in Livonia, Michigan. (R. 44, 196.) She also completed some management training at the Kellogg School of Management and is a graduate of the Dale Carnegie Institute. (R. 44-45, 196.) Plaintiff worked at Michigan Bell Telephone from 1969-1990, in a variety of capacities; including, service representative and supervisor. (R. 193-96.) She also

13

worked at Ameritech from 1990-1997, in different capacities; including a managerial position. (R. 193.)

Plaintiff testified that in February 1997, she experienced an intense flare-up of her fibromyalgia and arthritis, at which point she initially worked "flex-time"[11] and eventually went on medical leave. (R. 48.) Plaintiff testified that her employer (Ameritech) "declared her surplus" in June 1997, and that she no longer had a job. (R. 50.) Since her flare-up in February 1997, Plaintiff stated that she has been "Trying to get better. I've gone to physical therapy and tried to help myself get better." (R. 51.) Plaintiff stated that she stretches, tries to walk and takes epsom salt baths to work out her physical pain. (R. 51-52.)

At the administrative hearing, Plaintiff testified that the pain in her back extends from her neck to her tailbone and is present every day. (R. 69.) Plaintiff also stated that she has pain in her groin daily. (R. 69.) She stated that she has numbness or "lack of feeling" in her feet on most days. (R. 67-68.) On a scale of one to ten, ten being the highest, Plaintiff testified that her average daily pain was "about six. Can go up to eight. Some days it's a ten." (R. 73.) When asked how many goods days she has in a month, Plaintiff stated two to four days, but "It doesn't mean I won't cry or get angry." (R. 73.) Plaintiff stated she has four to eight really bad days when she is unable to do much besides stay in bed. (R. 74.) Plaintiff stated that she has difficulties with her memory and concentration. (R. 70.) She stated that she often starts projects but is unable to complete them. (R. 70-71.) Plaintiff testified that over the years she has "changed considerably" and she has become short-tempered with her family and friends. (R. 72.) Plaintiff stated that, ". . . I used to have all

---

[11]Plaintiff's "flex-time" schedule was equivalent to full-time work. (R. 49.) Plaintiff did not work on a part-time basis. (R. 49.)

these good qualities, but I don't anymore." (R. 72.)

Plaintiff testified that her husband, daughter and maid service took care of household tasks; such as, laundry and cooking. (R. 74.) With respect to shopping, Plaintiff stated that ". . . my husband takes me. We try to do it together, or he'll go and do the errands and leave me at home." (R. 75.) Plaintiff also indicated that her other daily activities included visiting family, watching television, reading, doing home exercises, and doing small tasks. (R. 202-203, 206.)

In terms of walking, Plaintiff testified that she "probably could walk 20 minutes, or 30 minutes." (R. 65.) Plaintiff stated that she is able to stand for about twenty minutes, but that she must lean against things before her back starts to cause her problems. (R. 76.) Plaintiff also stated she is able to sit about twenty minutes before she feels the need to get up and move around. (R. 76.) Plaintiff also indicated that she wore a back brace and right wrist splint occasionally. (R. 65-66.)

## III.  VOCATIONAL EXPERT'S TESTIMONY

Ms. Sheryl Hoiseth, a VE, testified at the administrative hearing. (R. 84-94.) Ms. Hoiseth classified Plaintiff's past management and supervisory positions as skilled, light work. (R. 86-87.)

Ms. Hoiseth was asked to assume a hypothetical person of Plaintiff's age, educational level, and past work experience. (R. 87-88.) The ALJ asked Ms. Hoiseth if a hypothetical person with Plaintiff's vocational characteristics and residual functional capacity ("RFC") who could stand and/or walk for two hours in an eight-hour workday and sit for six hours in an eight-hour workday (with normal breaks) could perform any jobs in the national economy. (R. 88-92.) Ms. Hoiseth stated that while Plaintiff could not return to her past relevant work, (R. 88-89) she had the capacity to perform a limited range of sedentary work and consequently, she could perform the following jobs: packager (approximately 2,000) and inspector (approximately 1,000). (R. 90-94.)

15

Ms. Hoiseth also testified regarding Dr. Dachman's thirty minute sit/stand limitation. She

provided the following testimony in response to the ALJ's hypothetical question:

> ALJ:   If we were to assume further that the individual must be allowed to alternate
> between sitting and standing positions at intervals of approximately 30
> minutes for a period of 5 to 10 minutes on each such occasion, what impact
> if any would that have upon the remainder of the work base. This would
> include since we're - I guess we're referring only to the inspector and
> assemble - inspector and packager work, right?
>
> VE:   Yes. It would eliminate the work. (R. 93.)

## IV.   THE ALJ'S FINDINGS AND DECISION HEREIN.

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since

February 20, 1997, the onset date of her disabling condition. (R. 30.) The medical evidence

establishes that Plaintiff has fibromyalgia, sacroiliitis, ischial bursitis, pelvic malalignment, right

should impingement, right lateral epicondylitis, mild lumbar radiculopathy, history of carpal tunnel

syndrome, arthritis in her back, memory difficulties, a personality disorder and depression. (R. 30.)

The ALJ further determined that Plaintiff's impairments significantly limit her ability to perform

basic work activities and therefore, they are severe. (R. 30.) Plaintiff, however, does not have an

impairment or combination of impairments listed in, or medically equal to one listed in 20 C.F.R.

Pt. 404, Subpt. P, App. 1, Regulations No. 4. (R. 30.)

Because the ALJ found that Plaintiff's impairments did not meet or equal a listed

impairment, the ALJ assessed Plaintiff's RFC to determine what she could do despite her limitations.

(R. 30.) The ALJ found that Plaintiff has the RFC to perform the requirements of work except that

she could not stand and/or walk for more than a combined total of two hours in an eight-hour

workday; she could not sit for more than six hours in an eight-hour workday (with normal breaks);

16

she must be allowed to alternate between sitting and standing positions at intervals of one hour for a period of five to ten minutes on each occasion; she could not lift and/or carry more than ten pounds frequently and twenty pounds occasionally; she could not lift her right arm overhead more than occasionally; she could not climb ladders, ropes or scaffolds; she could not climb ramps or stairs, balance, stoop, kneel, crouch or crawl more than occasionally; she could not work with or near exposed, unprotected dangerous machinery or heights; she could not maintain such extended attention or concentration as is required to carry out detailed and/or complex work instructions and/or tasks; and she could not interact with the general public more than occasionally. (R. 30-31.) Thus, the ALJ concluded that Plaintiff has the RFC to perform a limited range of sedentary work, subject to the above specified limitations; however, Plaintiff is unable to perform her past relevant work. (R. 31.)

The ALJ determined that in view of Plaintiff's vocational characteristics and RFC, the Medical-Vocational Guidelines were not applicable. 20 C.F.R. Pt. 404, Subpt. P, App. 2. (R. 31.) However, using Rule 201.21 or 202.21 as a framework, as supplemented by the VE's testimony, the ALJ concluded that Plaintiff could perform a significant number of jobs in the national economy. (R. 31) Plaintiff, therefore, is capable of performing packager and inspection jobs. (R. 31.)

The ALJ further found that Plaintiff's allegations of disabling symptoms and limitations were not fully credible. (R. 30.)

Accordingly, the ALJ found that Plaintiff was not disabled under the terms of the Act. (R. 32.)

## **LEGAL STANDARDS**

## I.     **STANDARD OF REVIEW**

Judicial review of the Commissioner's final decision is limited. The Act at 42 U.S.C. § 405(g) establishes that the Commissioner's findings as to any fact are conclusive if they are supported by substantial evidence. *See also Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Pearles*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Brewer*, 103 F.3d at 1390. The court may not reevaluate the facts, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *See Brewer*, 103 F.3d at 1390. Conclusions of law, however, are not entitled to deference. Thus, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *See Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## II.   STATUTORY AND REGULATORY FRAMEWORK

To receive disability benefits, SSI and DIB claimants must be "disabled" as defined by the Act. *See* 42 U.S.C.§ 423(a)(1)(D); 42 U.S.C. § 1382(a); *Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993). An individual is "disabled" if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). *See also Jones v. Shalala*, 10 F.3d 522, 523-24 (7th Cir. 1993). To satisfy this definition, an individual must have a severe impairment that renders him unable to do his previous work or any other substantial gainful activity that exists in the national economy. *See* 20 C.F.R. § 404.1505(a).

The Social Security regulations delineate a five-step process for determining whether a claimant is disabled within the meaning of the Act. *See* 20 C.F.R. § 404.1520. The ALJ first

considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. § 404.1520(b). If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. Pt. 404, Subpt. P, App.1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. *See Brewer*, 103 F.3d at 1391.

If the impairment does not so limit the claimant's remaining capabilities, the fourth step is that the ALJ reviews the claimant's RFC and the physical and mental demands of his past work. RFC is a measure of what an individual can do despite the limitations imposed by his impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a). *See also* Social Security Ruling 96-8p (1996). If the claimant can perform his past relevant work, he will be found not disabled. *See* 20 C.F.R. § 404.1520(e).

For the fifth step, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant -- in light of his age, education, job experience and functional capacity to work -- is capable of performing other work and that such work exists in the national economy. *See* 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f). *See also Brewer*, 103 F.3d at 1391.

## ANALYSIS

Plaintiff seeks reversal or remand of the ALJ's decision finding that she is not disabled. Plaintiff alleges, *inter alia*, that (1) the ALJ's determination that Plaintiff's condition would

be compensated by allowing her to change positions every hour, for a period of five to ten minutes on each occasion, is without support in the record, ignores repeated assessments that Plaintiff needed to change positions every thirty minutes and thus is not supported by substantial evidence; (2) the ALJ ignored Plaintiff's non-exertional impairments which includes her ability to concentrate; and (3) the ALJ failed to follow the mandates of Social Security Ruling ("SSR") 96-7p when assessing Plaintiff's credibility. Pl.'s Mem. at 14-15, 26.

## I. THERE IS NO BASIS IN THE RECORD FOR THE ALJ'S FINDING THAT PLAINTIFF'S CONDITION WOULD BE COMPENSATED BY ALLOWING HER TO ALTERNATE BETWEEN SITTING AND STANDING POSITIONS AT INTERVALS OF ONE HOUR.

The Court initially notes that the ALJ's determination that Plaintiff's condition would be compensated by allowing her to change positions every hour is wholly without support in the record. Specifically, there is absolutely no basis in the 854 page record for the ALJ's determination that Plaintiff must be allowed to alternate between sitting and standing positions at intervals of one hour for a period of five to ten minutes on each such occasion. (R. 30.) For instance, there are no clinical or laboratory findings or medical reports from Dr. Dachman, Plaintiff's treating physician indicating that she must alternate between sitting and standing positions at one hour intervals. In fact, Dr. Dachman explicitly states that: "Osteoarthritis and fibromyalgia made it impossible for [Plaintiff] to sit or stand for periods of thirty minutes without excruciating pain." (R. 667.) Moreover, there are no state agency physicians who have specified a one hour sit/stand limitation. In addition, the Court notes, respectfully, that Defendant, in its Memorandum, does not discuss or explain the ALJ's basis for finding that Plaintiff's condition would be compensated if she alternated between sitting and standing positions at one hour intervals. *See generally*, Def.'s Mem. Furthermore, in the ALJ's

decision, he does not provide any basis or justification for establishing a one hour sit/stand limitation.

The Court, therefore, finds that the one hour sit/stand limitation recited and employed by the ALJ is unsupported by any substantial evidence in the record.

## II.  THE ALJ ERRED BY NOT GIVING CONTROLLING WEIGHT TO THE MEDICAL OPINION OF PLAINTIFF'S TREATING PHYSICIAN.

Plaintiff argues that the ALJ ignored repeated assessments by Dr. Dachman, Plaintiff's treating physician, that she needed to alternate between sitting and standing every thirty minutes. Pl.'s Mem. at 14-15,17. Defendant, on the other hand, asserts that Dr. Dachman's thirty minute sit/stand limitation was not supported by clinical or laboratory findings and is contradicted by other substantial medical evidence in the record; namely, the opinions of two non-examining state agency physicians. Def.'s Mem. at 11-12.

A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000) (*citing* 20 C.F.R. § 404.1527(d)(2)); SSR 96-2p.) The SSA regulations provide that when evaluating medical opinions about a claimant's impairment or disability, more weight is given to "the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(4). Moreover, "[g]enerally, we give more weight to opinions from [a claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique

21

perspective to the medical evidence that cannot be obtained from the objective findings alone or from reports of individual examinations . . ." 20 C.F.R. § 404.1527(d)(2). If, however, a medical opinion is not entitled to controlling weight, it is accorded deference and must be weighed using the factors set out in the regulations.[12] The ALJ is required to give "good reasons in [the] notice of determination or decision for the weight [given to a] treating source's opinion." *Id.*; *See also* SSR 96-2p.

## A. Objective Medical Evidence

The Court initially notes that the parties do not dispute that Plaintiff suffers from fibromyalgia.[13] (R. 30.) The Seventh Circuit described the disease in *Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996), as follows:

> Marlin Sarchet was denied social security disability benefits, challenged the denial in the district court, lost, appeals. She is 42 years old, with a graduate equivalency degree, but she has not worked since 1978. She claims that in 1990 she became totally disabled as a consequence of fibromyalgia, also known as fibrositis--a common, but elusive and mysterious disease, much like chronic fatigue syndrome, with which it shares a number of features. *See* Frederick Wolfe et al., "The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia: Report of the Multicenter Committee," 33 *Arthritis & Rheumatism* 160 (1990); Lawrence M. Tierney, Jr., Stephen J. McPhee & Maxine A. Papadakis, *Current*

---

[12]The following factors are used in determining the weight given to a treating physician's opinion when it is not given controlling weight: (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) supportability (the more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight is given to that opinion); (4) consistency (the more consistent an opinion is with the record as a whole, the more weight it is given); (5) specialization (more weight is given to the opinion of a specialist about medical issues related to that source's specialty); and (6) other factors (those factors which tend to support or contradict an opinion). 20 C.F.R. § 404.1527(d)(2)(i)(ii); 404.1527(d)(3)-(6).

[13]In fact, Plaintiff has one of the more severe cases of fibromyalgia and associated Raynaud's syndrome. (R. 667.) Plaintiff also suffers from severe arthritis in her back and hands and tendentious, sacroiliitis, ischial bursitis, pelvic malalignment, right shoulder impingement, right lateral epicondylitis, mild lumbar radiculopathy, carpal tunnel syndrome, back arthritis, memory difficulties, personality disorder, and depression. (R. 30.)

*Medical Diagnosis & Treatment 1995* 708-09 (1995). Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and -- the only symptom that discriminates between it and other diseases of a rheumatic character -- multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

All these symptoms are easy to fake, although few applicants for disability benefits may yet be aware of the specific locations that if palpated will cause the patient who really has fibromyalgia to flinch. There is no serious doubt that Sarchet is afflicted with the disease but it is difficult to determine the severity of her condition because of the unavailability of objective clinical tests. *Some people may have such a severe case of fibromyalgia as to be totally disabled from working,* Michael Doherty & Adrian Jones, "Fibromyalgia Syndrome (ABC of Rheumatology)," 310 *British Med.J.* 386 (1995); *Preston v. Secretary of Health & Human Services,* 845 F.2d 815, 818 (6th Cir. 1988)(*per curiam*), but most do not and the question is whether Sarchet is one of the minority. (emphasis added.)

The Court finds Defendant's assertion that the ALJ did not give Dr. Dachman's opinion regarding Plaintiff's need to alternate between sitting and standing at thirty minute intervals controlling weight because it was not supported by clinical and laboratory findings unavailing. The ALJ, in his decision, stated that "the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations." (R. 23.) The ALJ then cites the fairly normal clinical and medical test results obtained by Dr. Dachman.[14] (R. 23-26.) A cause of Plaintiff's disabling condition, however, is fibromyalgia, and, as discussed in *Sarchet, supra,* in most cases, there will be no objective medical evidence indicating the presence or severity of fibromyalgia. 78 F.3d at 306-07. The symptoms are subjective and laboratory tests are of little value. *Id.* That being said, however, the medical record shows that Plaintiff has eleven of the eighteen tender spots needed to confirm a diagnosis of fibromyalgia. (R. 648-740.) In addition, the extensive

---

[14]The ALJ also references Dr. Birnbaum's treatment notes from November 1994 through October 1997 indicating treatment for fibrositis and fibromyalgia. (R. 23.)

23

854 page record is replete with medical and progress notes tracking the debilitating course of Plaintiff's disease, which Dr. Dachman treated for several years.[15] (R. 667.) It also bears noting that it was not fibromyalgia alone that caused Plaintiff's condition. As Dr. Dachman stated: "Osteoarthritis and fibromyalgia make it impossible for [Plaintiff] to sit or stand for periods of thirty minutes without excruciating pain" and "[Plaintiff] has one of the more severe cases of fibromyalgia . . . along with severe arthritis in her back and hands and tendentious." (R. 667.)

In view of the foregoing, a sufficient basis did not exist for the ALJ's rejection of Dr. Dachman's opinion or for according his treating medical opinion lesser weight.[16]

## B.    Medical Evidence

Defendant next contends that other substantial medical evidence in the record supports Plaintiff's need to alternate between sitting and standing, but not as frequently as Dr. Dachman suggested. Def.'s Mem. at 11. Specifically, Defendant contends that two state agency non-examining physicians explicitly disagreed with Dr. Dachman's thirty minute sit/stand limitation and concluded that Plaintiff could stand and/or walk for a combined total of two hours and she could sit for six hours in an eight-hour workday, with no need to alternate between sitting and standing other than

---

[15]For example, the medical record reflects the fact that Plaintiff has received extensive medical treatment for her condition: (Medical records from December 30, 1993 to January 14, 1994 from Dr. Uhler) (R. 207-09); (Sitting problems . . . tightness in 1995)(R. 377); (Headaches)(R. 437); (Knee problems) (R.380); (Recommendation that Plaintiff sit or stand on an ad lib basis)(R.694); (Problems with back and walking for long periods)(R. 408); (Sitting for long periods aggravates pain)(R. 689, 695); (Tingling sensation up and down both legs)(R. 409); Physical therapy records)(R. 210-414); (Referral to send Plaintiff back to primary care physician for orthopedic consultation)(R. 415- 16); (Fibrositis suspected and confirmed)(R. 712, 720); (Referrals for fibrositis)(R. 544, 566, 573, 581, 588); (Medical records from June 18, 1994 to December 22, 1996 from Caremark, Inc.)(R. 417-25); (Treating physicians' prognosis/diagnosis) (R. 690-721, 793, 828); (Recent medical treatment, medications and work background)(R. 829-31); (Medical records in regard to Plaintiff's mental impairments)(R. 832-45); (Rx lists)(R. 423); (EMG's performed on Plaintiff)(R. 458, 467, 472, 475).

[16]The Court further finds that it reaches this same result by applying the appropriate regulations' six factor test set forth at footnote 12, *supra*.

· normal breaks. Def.'s Mem. at 11; (R. 636, 641, 749, 754.)

The Court finds, however, that the ALJ erred by discrediting the opinion of Dr. Dachman and accepting the opinions of two non-examining state agency physicians. First, the Court notes that Dr. Dachman is the Director of the Schaumburg Pain Therapy Center, Board Certified in internal medicine, pain management and rheumatology, and a Fellow of the American College of Rheumatology. (R. 475.) As demonstrated by Dr. Dachman's medical credentials, he clearly possesses extensive, specialized medical expertise in the treatment of rheumatic disorders; including fibromyalgia. *See e.g., Grindle v. Sullivan,* 774 F.Supp.1501, 1509 (N.D. Ill. 1991)(specialization and expertise play a role in determining which physicians' evaluations should be given more weight); 20 C.F.R. § 404.1527(d)(2)(ii)(the more knowledge a treating physician has about a claimant's impairment, the more weight is given to that source's medical opinion); 20 C.F.R. § 404.1527(d)(5)(more weight is given to the opinion of a specialist about medical issues related to his area of specialty than to the opinion of a source who is not a specialist). Based on the record, however, the state agency physicians are neither specialists in any particular field of medicine nor do they have any specialized expertise that would allow for a valid assessment of Plaintiff's condition.[17] Therefore, the state agency physicians' assessments should have been accorded lesser weight that of Dr. Dachman's comprehensive assessment of Plaintiff that began in November 1994 and extended over a period of years. *See also* 20 C.F.R. § 404.1527(d)(2)(i)(the longer a treating physician has treated a claimant, the more weight is given to that source's medical opinion).

Next, the Court notes that the state agency physicians never examined Plaintiff; rather, they merely reviewed her medical file. *See e.g.,* 20 C.F.R. § 404.1527(d)(1) (more weight is given to the opinion of a physician who has examined the claimant than to one who did not examine the

---

[17]It is unclear from the record if the state agency physicians are specialists in any particular field of medicine or what their medical backgrounds entail.

claimant); *Allen v. Weinberger*, 552 F.2d 781, 786 (7th Cir. 1977) (the opinions of treating physicians are entitled to greater weight than those of a physician who never examined plaintiff but merely reviewed plaintiff's medical file). As the court held in *Allen* with regard to the conclusions of physicians who merely reviewed the plaintiff's medical file and performed no examinations: ". . . the weight to be attached to the reports must be considered in light of the fact that neither physician examined the plaintiff. . . Their reports, without personal examination of the claimant, deserve little weight in the overall evaluation of liability. The (medical) advisers' assessment of what other doctors find is hardly a basis for competent evaluation." *Allen*, 552 F.2d at 786. (citation omitted.) *See also Whitney v. Schweiker*, 695 F.2d 784, 789 (7th Cir. 1982)(holding that the opinions of treating physicians should generally be given greater weight than the opinions of non-treating physicians where the state reviewing physician reviewed the claimant's medical record, but did not examine the claimant); *Grindle*, 774 F.Supp. at 1507-10 (same). Given the fact that the state agency physicians never personally examined Plaintiff, the Court finds that Dr. Dachman's opinion should have been accorded more weight than those of the state agency physicians.

The Court next notes that the state agency physicians made their medical assessments on pre-printed questionnaires, by placing checkmarks in boxes next to alternative medical statements already printed on the form. (R. 635-42, 748-55.) At the end of each form, each state agency physician wrote a brief note in a few sparsely worded sentences indicating his recommendation. (R. 641-42, R. 754-55.) *See e.g., Garrison v. Heckler*, 765 F.2d 710, 713, 715 (7th Cir. 1985)("a bare statement of a consulting specialist is not substantial evidence when the specialist does not examine the patient" and the "ability to observe the claimant over an extended period is essential to an accurate understanding.")(citations omitted)[18]; *cf. Richardson*, 402 U.S. at 402; 91 S.Ct. 1420, 28

---

[18]*Garrison* holds that a consulting physician's report may provide substantial evidence to

(continued...)

L.Ed.2d 842 (the report of an examining consulting physician may constitute substantial evidence

for a finding of no disability). Thus, when comparing the nonexamining state agency physicians'

sparse review and evaluation of Plaintiff's condition to that of Dr. Dachman's extensive, lengthy

treatment and comprehensive, detailed assessment over time of Plaintiff's disabling condition

contained in the 854 page record, the state agency physicians' minimal assessments can in no way

be viewed as substantial evidence which can serve as a basis for according Dr. Dachman's opinion

lesser weight. *See e.g., Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir. 1985)("When experience

backed by observation is set against the 'speculative statement' of a consulting physician, substantial

evidence lies on the side of the treating physician.")(citation omitted.)

    The ALJ should have given controlling weight to the findings of Dr. Dachman. The only

medical evidence in the record that contradicts Dr. Dachman's opinion comes from the

nonexamining state agency physicians' reports. The reports from nonexamining physicians cannot

by themselves trump the findings from treating sources. *Lester v. Chater,* 81 F.3d 821, 831 (9th Cir.

1995) "The opinion of a nonexamining physician cannot by itself constitute substantial evidence

that justifies the rejection of the opinion of either an examining physician or a treating physician."

*Id.* (citations omitted). Furthermore, there is no evidence in the record which could reasonably

---

[18](...continued)
override the views of a treating physician "when the consulting physician brings to the case
something of value to the administrative decision, such as greater expertise with an ailment,
greater impartiality, or a greater range of experience that facilitates a comparison of one case
against a standard or rule of decision." 765 F.2d at 713. *Garrison* confirms that "a consulting
physician cannot supply substantial evidence just by contradicting reports about underlying facts
or offering unfounded speculation. But when the consulting physician adds new information or
perspectives, that may be substantial evidence." *Id.* (citations omitted.) *Garrison* thus reasons
that a consulting physician who specializes in the type of condition that afflicts the claimant may
be in a better position than a general practitioner to evaluate the degree of functional limitation
associated with that condition. *Id.* It is important to note that *Garrison* was a black-lung case in
which the medical evaluations were primarily based on objective evidence, in which case there
was no reason to give preference to the opinions of the treating physician. *Id.* at 714. Both the
treating and consulting physicians in *Garrison* had observed the claimant "first hand." *Id.* at 715.

support the conclusion that Dr. Dachman's findings are medically unsupported and inconsistent with other substantial evidence in the record. Rather, the only reasonable interpretation from the record is that Dr. Dachman's findings are medically supported based on years of expert treatment, clinical observations and other independent medical evidence (e.g., MRI's and EMG's) substantiating Plaintiff's disabling disease. The ALJ, therefore, should have given controlling weight to Dr. Dachman's findings.

Since the ALJ should have given controlling weight to Dr. Dachman's findings, it is pivotal to note that at the administrative hearing, the VE provided the following testimony based on Dr. Dachman's thirty minute sit/stand limitation:

> ALJ: If we were to assume further that the individual must be allowed to alternate between sitting and standing positions at intervals of approximately 30 minutes for a period of 5 to 10 minutes on each such occasion, what impact if any would that have upon the remainder of the work base. This would include since we're - I guess we're referring only to the inspector and assemble - inspector and packager work, right?
>
> VE: Yes. It would eliminate the work. (R. 93.)

Consequently, and in short, a finding of disability is called for.

### C.    Other Substantial Evidence

Defendant, however, contends that other substantial evidence in the record supports the ALJ's conclusion that Plaintiff is not disabled. Specifically, Defendant asserts that Dr. Dachman's own clinical findings do not support such a severe limitation in sitting and standing; namely, that, Plaintiff can only sit or stand for thirty minute intervals; Dr. Dachman's medical opinion was based, in large part, on Plaintiff's subjective complaints; and Dr. Dachman's medical opinion was inconsistent with Plaintiff's own statements. Pl.'s Mem. at 12-13.

The Court finds Defendant contention that Dr. Dachman's own clinical findings do not support a finding that Plaintiff must alternate between sitting and standing positions at thirty minute

intervals unmeritorious. Def.'s Mem. at 12. Defendant references four pages in the administrative record; specifically, R. 658 (October 30, 1997 treatment record), R. 666 (June 3, 1997 treatment record), R. 668 (May 6, 1997 treatment record), and R. 678 (September 6, 1997 letter written by Dr. Dachman), as support for its proposition that Plaintiff's condition improved with treatment during the relevant period; consequently, her condition was effectively controlled by treatment. *Id.*; *See e.g. Warford v. Bowen*, 875 F.2d 671, 673 (8th Cir. 1989)("A medical condition that can be controlled by treatment is not disabling.")(citations omitted.) The Court notes, however, that Dr. Dachman's clinical findings and medical assessment do not, in fact, support a conclusion that Plaintiff's condition improved with treatment. Rather, when viewing the pages referenced by Defendant, in light of the medical record as a whole, the referenced pages merely reflect medical diagnoses and a treatment history that indicate that Plaintiff's fibromyalgia has had remissions and exacerbations. Moreover, the Court notes that in a letter dated December 23, 1997, a page from the record that was not referenced by Defendant, Dr. Dachman opined that Plaintiff was not able to sit or stand for more than thirty minutes at a time and he "wholeheartedly recommend[ed] disability." (R. 656.) It bears noting that Dr. Dachman wrote this letter *after* the period of time which Defendant alleges that Plaintiff's condition had significantly improved. (*See* R. 658, 666, 668, 678.)

The Court next finds Defendant's assertion that Dr. Dachman's opinion was, in large part, based on Plaintiff's subjective complaints without merit. Def.'s Mem. at 12-13. For example, Defendant contends that, in March 1997, Plaintiff told Dr. Dachman that her back pain made it impossible for her to sit or stand for more than thirty minutes at a time, but that she was fine if she could switch positions frequently. *Id.* (R. 670.) The Court first notes that it is not clear from the record whether Dr. Dachman's annotation reflecting the fact that Plaintiff could not sit or stand for more than thirty minute intervals was based on a statement Plaintiff made to Dr. Dachman or

whether it was based on Dr. Dachman's extensive observation and/or treatment of Plaintiff. Next, Defendant cites *Butera v. Apfel*, 173 F.3d 1049, 1056-57 (7th Cir. 1999) for proposition that an ALJ may properly discount a treating physician's opinion when it is based on a claimant's subjective complaints. However, *Butera* is not apposite here. In *Butera,* the treating physician's medical opinion was based on a "one-time emergency room examination" of the claimant. *Id.* Moreover, in *Butera,* the treating physician "expressly stated" that her findings were based, in part, on the claimant's subjective complaints. *Id.* Here, in contrast, Dr. Dachman's medical opinion was based on extensive observation and treatment of Plaintiff and there is no indication in the record that Dr. Dachman based his medical assessment, solely or significantly on Plaintiff's subjective complaints of pain. Rather, as discussed throughout this opinion, Dr. Dachman assessment is based on years of treatment, clinical observations and other independent medical evidence substantiating Plaintiff's disabling disease.[19]

The Court next finds that Defendant's assertion that Dr. Dachman's opinion was inconsistent with Plaintiff's own statements cannot prevail. First, Defendant asserts that Plaintiff attempted to return to her full-time position as a manager at Ameritech (but could not do so because she was declared surplus) one month after Dr. Dachman opined that Plaintiff was disabled from working and could not sit or stand for more than thirty minute intervals. Def.'s Mem. at 13. Herein, Plaintiff has an extensive work record reflecting that she has been employed from 1967 until she became disabled in February 1997. (R. 137-38, 129-36.) Plaintiff has continuously indicated a strong desire to return to work and her work ethic is clearly exemplified by the record. *See e.g., Dobrowolsky v. Califano,*

---

[19]It also bears noting that fibromyalgia is a qualifying impairment for which subjective pain testimony may be considered. *See e.g., Sarchet*, 78 F.3d at 305; *Kelly v. Callahan*, 133 F.3d 583 (8th Cir. 1998); *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815 (6th Cir. 1988)(*per curiam*). As stated *supra* fibromyalgia is an "elusive and mysterious disease" and "its symptoms are entirely subjective." *Sarchet*, 78 F.3d at 306.

606 F.2d 403, 409 (3rd Cir. 1979)(a claimant with a good work record is entitled to substantial credibility when claiming an inability to work as a result of disability); *Duncan v. Harris*, 518 F.Supp. 751, 758 (E.D.Ark. 1980) (the court emphasized the importance of a consistent work history in assessing a claimant's credibility)(citation omitted.) Thus, contrary to Defendant's assertion, Plaintiff is clearly entitled to substantial credibility in that she has continuously worked throughout her lifetime and sought employment despite her disabling condition. The Court, therefore, cannot find that Plaintiff's desire to continue working as being inconsistent with Dr. Dachman's finding of disability and the fact that she could not sit or stand for more than thirty minute intervals.

Defendant next asserts that Plaintiff's reported daily activities, which include doing some household chores (e.g., dusting and making the bed), small tasks, and home exercises as well as shopping, and visiting her family two to three times a week are inconsistent with Dr. Dachman's medical opinion that Plaintiff cannot sit or stand for more than thirty minute intervals. (R. 64, 75, 202, 206.) Moreover, Defendant asserts that Plaintiff desire to take classes in Interior Design by correspondence and move to Florida when her home was sold are also inconsistent with Dr. Dachman's medical opinion. (R. 28.) The Court initially notes that because Plaintiff is able to perform some daily activities on an occasional basis does not mean that the severity of her pain is less credible. *See e.g.* 20 C.F.R. § 404.1572(c)("Generally, we do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity"); *Clifford*, 227 F.3d at 872 (noting "minimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity"); *Zurawski v. Apfel*, 245 F.3d 881, 887 (7th Cir. 2001)(finding that the plaintiff's activities "[were] fairly restricted (e.g., washing dishes, helping his children prepare for school, doing laundry, and preparing dinner) and not of a sort that necessarily undermines or contradicts a claim of disabling

31

pain.") Based on the record, Plaintiff has a limited number of daily activities that she is capable of performing. Plaintiff's ability to perform these activities is not indicative of the fact that her pain is not disabling and consequently, inconsistent with Dr. Dachman's opinion. The fact that Plaintiff can perform some occasional daily activities does not, in itself, mean that she is capable of working or engaging in substantial gainful activity.[20] *See e.g.,* 20 C.F.R. § 404.1572(c). Rather, Dr. Dachman specifically opined that Plaintiff cannot sit or stand for more than thirty minute intervals, and when considering his opinion, in conjunction with the VE's testimony, Plaintiff is unequivocally disabled.

The Court concludes that there is no evidence in the record to indicate that Plaintiff is not credible. For example, the medical records reflect that Plaintiff consistently sought medical treatment for her impairments and pain over an extended period of time. Based on the record, Plaintiff diligently pursued physical therapy and adhered to her treating physician's recommendations. Moreover, Plaintiff, in spite of her impairments, wanted to return to work part-time[21], something Dr. Dachman suggest was possible at one time. (R. 669.) The Court, therefore, finds that there is no evidence in the 854 page record of either malingering or exaggeration on the part of Plaintiff. Contrary to what the ALJ recognized, Plaintiff worked very hard to get better, but, unfortunately, she could not, and consequently, she is disabled.

---

[20]In addition, Plaintiff's interest in pursuing classes in Interior Design by correspondence, which is even less than authorized "school attendance," and the fact that she was planning to move to Florida are not inconsistent with Dr. Dachman's medical opinion. Rather, these activities are analogous to daily activities, in that, Plaintiff's ability to perform them, does not mean that she is capable of working or engaging in substantial gainful activity.

[21]A claimant is disabled if he cannot perform full-time work. *SSR* 96-8p ("[o]rdinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule." In addition, once a claimant has stopped working, he is considered disabled if he is only able to perform part-time work. *Ratto v. Sec'y of Health & Human Servs.*, 839 F.Supp1415, 1430-31 (D.Or. 1993); *Rodriguez v. Bowen*, 876 F.2d 759, 762-63 (9th Cir. 1989) (claimant who could only work four hours a day was presumptively disabled).

The Court also notes that there is no evidence in the record to indicate that Dr. Dachman's medical opinion lacks credibility. *See e.g., Dixon v. Massanari,* 270 F.3d 1171, 1177 (7th Cir. 2001)("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.")(citation omitted.) In *Dixon,* the ALJ determined that "[the plaintiff's treating physician] was not completely objective--that she gave [the plaintiff] the benefit of the doubt whenever possible." *Id.* at 1177. Herein, the Court notes that there is no evidence in the record to indicate that Dr. Dachman was biased in Plaintiff's favor. Rather, it only appears that Dr. Dachman, a medical specialist in this area, based his assessment of Plaintiff's condition on his extensive long term treatment and medical expertise when he determined that it was impossible for Plaintiff to sit or stand for periods of thirty minutes without excruciating pain and that she would, therefore, need to alternate between these positions at thirty minute intervals. (R. 667.) Moreover, "[s]imply because a nonexamining physician may disagree with the conclusions of a treating physician, that is not enough to support a finding that the treating physician's evidence is not credible." *Whitney,* 695 F.2d at 789. Therefore, because the Court finds that Dr. Dachman is credible, in that his opinion was based on years of treatment, clinical observations and other independent medical evidence substantiating Plaintiff's disease, his opinion, as discussed *supra* is entitled to controlling weight because he had "greater familiarity" with Plaintiff's conditions and circumstances. *Grindle,* 774 F.Supp. at 1508; *Whitney,* 695 F.2d at 789 (the report of a treating physician should be favored over that of a consultant who merely reviews the medical file and does not examine the claimant, unless the treating physician is not credible).

In view of the foregoing, the Court finds that Defendant's additional arguments do not constitute substantial evidence in the record that would warrant a finding that Plaintiff was not disabled.

## III. THE COURT'S FINDING

Section 405(g) confers judicial authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A court need not remand a cause "when no useful purpose would be served by further administrative proceedings, or when the record has been fully developed and there is not sufficient evidence to support the ALJ's conclusion." *Holden v. Shalala*, 846 F.Supp. 662, 669-70 (N.D.Ill.1994)(citations omitted.) Because, herein, the step five outcome is clear, the Court finds that no useful purpose would be served by a remand which would lead to the same ultimate conclusion. Moreover:

> When the ALJ fails to point to clear and convincing reasons for rejecting the conclusion of the treating physician, or provide specific, legitimate reasons based on evidence for disregarding that conclusion, and when the administrative record is fully developed, benefits should be awarded. *Grindle*, (*quoting Boyes v. Sullivan*, 901 F.2d 717, 722-23 (9th Cir. 1989) (citations omitted)

*See also Willis v. Callahan*, 979 F.Supp. 1299, 1306 (D.Or.1997) (reversed and remanded for an award of benefits where the ALJ improperly discredited the opinions of the plaintiff's two treating physicians that she was disabled from fibromyalgia and accepted the opinions of two nonexamining state reviewing physicians); *Opgenorth v. Shalala*, 897 F.Supp.1199, 1202-04 (E.D.Wis. 1995)(reversed and remanded for an award of benefits where the ALJ discredited the plaintiff's testimony as well as the opinions of her four treating physicians regarding chronic fatigue syndrome and fibromyalgia; and, instead, relied on the opinion of a nonexamining state reviewing physician in finding that the plaintiff was not disabled); *Glenn v. Apfel*, 102 F.Supp.2d 1252,1260 (D. Kan. 2000) (reversed and remanded for an award of benefits where the ALJ discredited the opinions of the plaintiff's treating physicians and accepted the opinions of the state consultative examiners in finding that the plaintiff was not disabled from fibromyalgia).

Because the record is fully developed, it is appropriate for the Court to reverse the ALJ's

decision outright. The Court finds that substantial evidence does not support the ALJ's decision that Plaintiff could engage in substantial gainful activity. A review of the record supports the conclusion that Plaintiff was disabled. Accordingly, the Court finds that Plaintiff is disabled under the terms of the Act.

**CONCLUSION**[22]

Accordingly, the Court grants Plaintiff's Motion for Summary Judgment or Remand and denies Defendant's Motion for Summary Judgment. The decision below is reversed and the cause is remanded to the Commissioner with instructions for an immediate award of benefits consistent with this Memorandum Opinion and Order.

**ENTER:**

_Ian H. Levin_

**IAN H. LEVIN**
**U.S. Magistrate Judge**

**Dated: July 9, 2002**

---

[22]In view of the Court's ruling herein, it is deemed unnecessary to consider Plaintiff's and Defendant's other arguments raised herein.